# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00464-CV

## In the Matter of M.C.L.

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. J-16,325, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

After waiving his right to a jury trial, M.C.L., a juvenile, was adjudicated delinquent for committing the offenses of resisting arrest, two counts of assault on a public servant, and criminal mischief in an amount more than $500 but less than $1,500. *See* Tex. Fam. Code Ann. ' 54.03 (West 2002); *see also* Tex. Pen. Code Ann. '' 22.01, 28.03, 38.03 (West 2003). The court held a disposition hearing and ordered M.C.L. committed to the Texas Youth Commission for an indeterminate period of time not to exceed M.C.L.=s twenty-first birthday. By five issues, M.C.L. challenges the legal and factual sufficiency of the evidence to support the juvenile court=s judgment. We conclude that the evidence is legally insufficient to support the juvenile court=s finding that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500. The evidence is sufficient, however, to support a finding that the criminal mischief caused pecuniary loss totaling $50 or more but less than $500. We further conclude that the evidence is legally insufficient to support the juvenile court=s finding of resisting arrest. Finally, we hold the evidence is

factually insufficient to support the court=s finding that M.C.L. committed assault on a public servant. We therefore reverse the juvenile court=s judgment of adjudication and its disposition order and remand the cause for further proceedings consistent with this opinion.

**BACKGROUND**

According to testimony at trial, on February 13, 2002, Travis County Juvenile Probation Officers Victor Valdez, Jason Hill, and Brent Horton, along with Travis County Deputy Constables Lucy Neyens and Damon Miller, went to M.C.L.=s home to attempt to serve a warrant on M.C.L.=s younger brother, a juvenile probationer. Although the brother was not at home, they found M.C.L., for whom they also had an outstanding arrest warrant. Neyens and Horton immediately arrested and handcuffed M.C.L.; he sat on the couch in handcuffs for about fifteen minutes while the officers searched the premises for his brother. The officers then removed M.C.L. and placed him in Neyens=s police car, where he waited for another ten or fifteen minutes while the officers went back to the house and continued searching.

While in the police car, M.C.L. managed to move his handcuffed hands from behind his back to the front of his body. This provoked the officers to place leg shackles on M.C.L. The events that transpired after the shackles were placed on M.C.L. are disputed. What is clear is that M.C.L., who had been sitting in the police car while the shackles were placed on him, suddenly stood up. The officers thought M.C.L. was trying to escape, and a struggle ensued. The officers wrestled M.C.L. back into the police car and shut the doors. M.C.L. then kicked out the car=s rear windows; the broken glass from the windows cut Horton.

M.C.L. was initially charged with two counts of assault on a public servant by cutting and kicking Miller, two counts of assault on a public servant by cutting and kicking Horton, and criminal mischief in an amount more than $1,500 but less than $20,000. At trial, the State amended its petition to reflect a charge of criminal mischief in an amount more than $500 but less than $1,500. After the State presented its case in chief, the juvenile court granted M.C.L.=s motion for a directed verdict on the charge of assault on a public servant by cutting Miller with glass and rendered an adjudication of not true as a matter of law. At the conclusion of the trial, the juvenile court adjudicated M.C.L. delinquent for committing the lesser included offense of resisting arrest by kicking Miller, two counts of assault on a public servant by cutting and kicking Horton, and criminal mischief in an amount more than $500 but less than $1,500. M.C.L. now challenges the sufficiency of the evidence to support the judgment of adjudication.

## DISCUSSION

### Standard of Review

Adjudications of delinquency in juvenile cases are based on the criminal standard of proof. *See* Tex. Fam. Code Ann. ' 54.03(f). We therefore review adjudications of delinquency in juvenile cases by applying the same standards applicable to sufficiency of the evidence challenges in criminal cases. *See In re E.P.*, 963 S.W.2d 191, 193 (Tex. App.CAustin 1998, no pet.).

In reviewing a legal sufficiency challenge, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See id.* (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). In a factual sufficiency review, we examine all the evidence in a neutral light, favoring neither party. *Johnson v. State*,

3

23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We will set aside the verdict only if the evidence is so weak as to be clearly wrong or manifestly unjust or if the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Zuliani v. State*, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003); *Johnson*, 23 S.W.3d at 11.

**Criminal Mischief**

By his first two issues, M.C.L. challenges the legal and factual sufficiency of the evidence to prove that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500.

A person commits the offense of criminal mischief if, without the consent of the owner, he intentionally and knowingly damages or destroys the tangible property of the owner. Tex. Pen. Code Ann. ' 28.03(a). Criminal mischief includes as an element the value of the injury inflicted. *See id.* ' 28.03(b); *Gallardo v. State*, 321 S.W.2d 581, 581 (Tex. Crim. App. 1959). The amount of pecuniary loss determines the punishment range for the offense. *See* Tex. Pen. Code Ann. ' 28.03(b). Section 28.06 of the penal code provides two methods for determining the diminution in property value caused by criminal mischief; the method used depends on whether the property was damaged or destroyed. *See id.* ' 28.06 (West 2003). If the property was destroyed, the amount of pecuniary loss is Athe fair market value of the property at the time and place of the destruction,@or if the market value cannot be ascertained, Athe cost of replacing the property within a reasonable time after the destruction.@ *Id.* ' 28.06(a). If the property was damaged, the amount of pecuniary loss is Athe cost of repairing or restoring the damaged property within a reasonable time after the damage occurred.@ *Id.* ' 28.06(b).

4

M.C.L. complains on appeal that the juvenile court erred in concluding that the amount of pecuniary loss exceeded $500 because this amount was based on the cost of replacing the broken windows with new windows, when the windows were actually replaced with salvaged windows at a lesser cost for labor only. In addition, the State presented no evidence regarding the value of salvaged windows. Thus, concludes M.C.L., the evidence is legally and factually insufficient to support the court=s judgment of adjudication for criminal mischief in an amount over $500.

Rex ADoc@ Lender, a shop supervisor with Travis County TNR Fleet Services, testified for the State but was never qualified as an expert. His responsibilities as the shop supervisor include overseeing the maintenance on county vehicles. When Neyens=s damaged police car was submitted to him, Lender assigned the repair job to a mechanic. Because the shop had on hand another patrol vehicle of the same year that had been totaled, Lender instructed the mechanic to pull the windows out of the totaled car and put them in Neyens=s car. Lender testified that it took about six hours of labor to complete the job, and the shop rate is $40 per hour. He did not testify as to the value of the salvaged windows used to repair the vehicle.

Lender also reported that he called EZ Auto Glass to obtain an estimate on replacing Athe two rear windows and also the rear vent glass windows and frames.@ Lender testified that the quoted price was $175 for each window and $559 for each rear vent, totaling $1,468 for all four. Although Lender called only EZ Auto Glass for the estimate, he testified that during his ten years of experience, he has called a number of other establishments to obtain estimates and has concluded that EZ Auto Glass usually provides the best prices.

The relevant statute states only that the amount of pecuniary loss is "the cost of repairing or restoring the damaged property." *Id.* ' 28.06(b). The court of criminal appeals has held that damaged property need not actually be repaired. *Elomary v. State*, 796 S.W.2d 191, 193 (Tex. Crim. App. 1990); *see also Sebree v. State*, 695 S.W.2d 303, 305 (Tex. App.—Houston [1st Dist.] 1985, no pet.). Requiring the State to establish the exact amount of money paid for the repairs, and to whom, would place a burden on the owner to have the property repaired before a conviction could be obtained. *See Sebree*, 695 S.W.2d at 305. Such a burden would enlarge the amount of proof required by the statute. *Id.* On the other hand, in dealing with estimates it is imperative that we distinguish between a witness merely stating from hearsay what someone else has said the damages might be and an individual who is qualified to provide an expert opinion of the fair market value of the cost of repairs to the damaged property. *Elomary*, 796 S.W.2d at 193-94. Thus, where the damaged property is not repaired, an unsubstantiated lay opinion as to the estimate of damage by an individual who is not competent to give an expert opinion as to repair costs is insufficient to prove the pecuniary loss without further evidence. *Id.*

The State in this case provided two different methods of demonstrating the cost of repairing the patrol vehicle: (1) the actual cost of repair with salvaged windows, which was $240 for labor, and (2) Lender=s testimony of an estimate of the cost of replacing the windows from EZ Auto Glass. The issue then is which of these constitutes evidence of the "cost of repair" for purposes of determining the pecuniary loss caused by M.C.L.=s conduct.

This is not a situation where the owner of the damaged property was unable to have the property repaired before the accused was tried for the charged offense. Rather, Lender testified as to the

actual cost of the repairs, thus providing the evidence specifically spelled out in the statute. *Cf. Elomary*, 796 S.W.2d at 192 (property owner could not recall exact cost of repair to her vehicle, but expert in appraising damage to vehicles testified that fair market value of repairs was over $500). We therefore hold that Lender=s testimony about EZ Auto Glass=s estimate of the cost of installing new windows is no evidence of the cost of this repair.

The State argues that even if we were to discount the estimate provided by EZ Auto Glass for new windows and rely on Lender=s testimony regarding the cost of labor, the juvenile court could have still determined the value of the salvaged windows was at least $260, which coupled with the $240 for labor, would amount to a pecuniary loss of at least $500. We disagree. The record is devoid of any evidence indicating the value of the salvaged windows. Even viewing the evidence in the light most favorable to the judgment, there is no evidence that the salvaged windows were worth at least $260. We thus sustain M.C.L.=s first issue.

Because the only evidence of the actual cost of repairs is $240, the evidence is legally insufficient to support the juvenile court=s judgment that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500.[1] Based on Lender=s testimony that the repairs took six hours of labor to complete at a rate of $40 per hour, we conclude that the evidence is legally and factually sufficient to support a finding that the pecuniary loss caused by M.C.L.=s conduct was at least $50 but less than $500. We therefore reverse the portion of the judgment finding M.C.L. to have committed criminal mischief in an

---

[1] Because we are reversing based on legal insufficiency, we need not reach M.C.L.=s factual sufficiency complaint.

amount more than $500 but less than $1,500 and remand with instructions that the juvenile court render a finding reflecting that the pecuniary loss caused by M.C.L.=s conduct was at least $50 but less than $500.

**Resisting Arrest**

By his third and fourth issues, M.C.L. challenges the legal and factual sufficiency of the evidence to support the finding that he resisted arrest, arguing that his arrest was already complete before he struggled with the police officers.

A person commits the offense of resisting arrest if he intentionally prevents or obstructs a person he knows is a peace officer from effecting an arrest. Tex. Pen. Code Ann. ' 38.03(a). AEffecting an arrest@ entails a process or transaction, which has a beginning and an end. *Lewis v. State*, 30 S.W.3d 510, 512 (Tex. App.CAmarillo 2000, no pet.); *Schrader v. State*, 753 S.W.2d 733, 735 (Tex. App.CAustin 1988, pet. ref=d). A conviction for resisting an arrest requires the obstruction or resistance to occur after the arrest begins but before it ends. *Lewis*, 30 S.W.3d at 512. In this case, we must determine when the arrest ended.

Generally, an officer is no longer effecting an arrest once his efforts to restrain or control the suspect are completed. *Id.* The court of criminal appeals has explained when an arrest is complete in the context of the escape statute. *Medford v. State*, 13 S.W.3d 769, 773 (Tex. Crim. App. 2000). The court held that an arrest is complete when (1) a person=s liberty of movement is successfully restricted or restrained, whether by physical force or the suspect=s submission to authority, and (2) a reasonable person in the suspect=s position would have understood the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest. *Id.* Because the occurrence of an arrest

8

cannot be determined by a bright-line test, whether an arrest has occurred must be determined on a case-by-case basis by examining the totality of the circumstances. *Lewis*, 30 S.W.3d at 513 (citing *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App. 1997)).

The testimony at trial revealed that after the officers encountered M.C.L. in his home, Neyens handcuffed him. Thus restrained, M.C.L. sat on his couch for approximately fifteen minutes, while the officers searched the house. There is no dispute that M.C.L. was cooperative while sitting on the couch in handcuffs. He was then escorted to the police car, where he was placed in the back seat of the car, still handcuffed, and the doors were shut. There is no dispute that M.C.L. did not struggle or resist while he was being transported to the car and was cooperative while waiting in the car. He waited in the car for another ten or fifteen minutes while the officers returned to his house to continue their search for his brother. During this time, M.C.L. managed to wriggle his handcuffed hands from behind his back to his lap. When Valdez noticed this, he decided to shackle M.C.L. He grabbed the shackles from another police vehicle and returned to M.C.L.; one of the deputy constables opened the back door, and Valdez placed the shackles on M.C.L.=s legs. M.C.L. complied during this procedure as well. It was only after the shackles had been placed on M.C.L.=s legs that he stood up and a struggle ensued.

The State contends that M.C.L. was not completely restrained at the time he began struggling, citing *Lewis*. We disagree. In *Lewis*, the appellant began resisting immediately after he was handcuffed and continued until another officer directed him to stop. 30 S.W.3d at 513. Nothing in the *Lewis* record indicated that Lewis had voluntarily tendered his hands to the officers as a sign of submission or otherwise knowingly submitted to their authority until after the struggle ended. *Id.* at 514. And although

9

Lewis did not exert force until after he had been handcuffed, the court of appeals emphasized that he initiated a struggle Aimmediately upon the heels of being restrained.@ *Id.* Indeed, the court acknowledged that had Lewis=s exertion of force not occurred Ain quick succession@ to his being cuffed, it could have been said that the arrest was already complete and the officers were merely transporting their suspect when the struggle began. *Id.* at 513.

In this case, the struggle did not immediately coincide with the placing of handcuffs on the suspect. While the struggle may have followed immediately on the heels of M.C.L. being shackled, it is clear that the officers had actually restrained and controlled M.C.L. well before he was placed in shackles. According to the record, M.C.L. voluntarily submitted to the officers= authority, first by submitting to being placed in handcuffs and sitting on the couch while the officers searched his house, then by cooperatively moving to the police car and remaining there for at least ten minutes while cuffed, and finally by submitting to being placed in shackles. The arrest was complete, at the earliest, when M.C.L. was handcuffed and placed on his couch, and at the latest when he was moved to the police car where he remained for at least ten minutes, still handcuffed. Viewing the evidence in the light most favorable to the verdict, we conclude that no rational trier of fact could have found that M.C.L. obstructed or prevented a police officer from Aeffecting an arrest,@ as the arrest was already complete by the time M.C.L. began exerting force. We therefore sustain M.C.L.=s third issue. We reverse that portion of the judgment finding that M.C.L. committed the offense of resisting arrest and remand to the juvenile court with instructions to render judgment in accordance with this opinion.[2]

---

[2] Because we hold that the evidence is not legally sufficient to support the resisting arrest

**Assault on a Public Servant**

By his fifth issue, M.C.L. challenges the factual sufficiency of the evidence to support the juvenile court=s finding that M.C.L. assaulted a public servant by kicking Officer Horton, causing him to suffer bodily injury.[3] An individual commits the offense of assault on a public servant if he Aintentionally, knowingly, or recklessly causes bodily injury to another@ and the offense is committed against Aa person the actor knows is a public servant while the public servant is lawfully discharging an official duty.@ Tex. Pen. Code Ann. ' 22.01(a)(1), (b)(1). The State and the juvenile have differing stories about the struggle that ensued after M.C.L. was placed in leg irons.

---

allegation, we need not reach M.C.L.=s fourth issue regarding the factual sufficiency of the evidence.

[3] M.C.L. was initially charged with four counts of assault on a public servant: (1) by cutting Miller with broken glass, (2) by kicking Miller, (3) by cutting Horton with broken glass, and (4) by kicking Horton. After the State presented its case in chief, the juvenile court rendered an adjudication of not true as a matter of law on the charge of assault on a public servant by cutting Miller with glass. At the conclusion of the trial, the juvenile court reduced the assault on a public servant by kicking Miller allegation to resisting arrest, but we have held that the evidence is legally insufficient to support the resisting arrest finding. M.C.L. does not challenge on appeal the juvenile court=s finding that he assaulted a public servant by cutting Horton with glass, and that part of the juvenile court=s judgment remains undisturbed. Under M.C.L.=s fifth issue, he challenges only the court=s finding that he assaulted Horton by kicking him.

11

M.C.L. testified that after the shackles were placed on him, he started to get out of the car because he thought he was being moved to another car. The officers thought M.C.L. was attempting to run, and one of them grabbed him by the neck and threw him against the car. M.C.L. felt more than one pair of hands around his throat and had trouble breathing, although M.C.L. could not recall who grabbed him by the throat. After holding him like this for about twenty seconds, the officers let go of M.C.L.=s throat and tried to pull him back into the police car. Because he was handcuffed and his legs were shackled, M.C.L. had trouble getting into the car. Although M.C.L. never admitted kicking any officer, he stated that the officers were saying he was fighting and struggling with them. They finally got him into the police car and closed the door.

The State=s version of the struggle differed somewhat. Valdez testified that after the shackles were placed on him, M.C.L. stood up, one of the constables grabbed him by his neck to subdue him, and Valdez went around to the other side of the car where he and another officer pulled M.C.L. inside the car. Horton was standing near M.C.L. at that time, although Valdez was Anot exactly sure how or what Mr. Horton grabbed or what he was doing.@ When M.C.L. kicked out one of the windows, he was pulled back out of the car so that the officers could attempt to Ahogtie@ him. Valdez thought Horton might have assisted in trying to hogtie M.C.L. Throughout his testimony, Valdez never mentioned that M.C.L. kicked Horton or anyone else.

Horton testified that after the leg irons were placed on M.C.L., Ahe just went off.@ Horton stated that Ait was basically the two deputies [Neyens and Miller] who were holding him [M.C.L.] down,@ although Horton was right there with them. Horton also stated that he did not suffer any injuries at that time.

12

He further testified that Athey@ (presumably, the two deputies) struggled to get M.C.L. back in the police car. Once inside, M.C.L. rolled on his back and started kicking. The deputies shut the door, and M.C.L. kicked and shattered a rear window. Shards of glass cut Horton=s hands.

Neyens testified that she was the officer who reached from around the open back door to grab M.C.L. around the neck after he was shackled and jumped to his feet. She further testified that she saw M.C.L. kick both Miller and Horton. She stated that M.C.L. Awas kicking both of them and spitting and trying to bite.@ After M.C.L. kicked out the window, he was taken out of the vehicle and placed on the ground, where Neyens, Miller, and Horton tried to secure and recuff him. Neyens stated that both Miller and Horton had cuts on their hands. She did not know if any of the officers= injuries were sustained as a result of the glass or if they were entirely from M.C.L. kicking their hands.

Miller testified that immediately after the shackles were placed on M.C.L=s legs, he stood up. He then began Ato thrash around moving his hands.@ Miller grabbed M.C.L.=s hands, and he was Astill thrashing around jumping@ and spitting and attempting to bite him. Miller thought Horton was between him and M.C.L. and the door at this time. While continuing to secure M.C.L.=s hands, Miller grabbed him under the jaw and tried to push him back into the car. At some point, M.C.L. Afolded in the middle and actually fell back into the car about halfway.@ Miller leaned into the car and continued to secure M.C.L.=s hands; he did not believe that M.C.L. was still kicking at that point. Neyens then ran around to the other side of the car and pulled M.C.L. all the way into the back seat of the car, and they closed the doors. When asked if M.C.L. ever kicked Miller with his feet, Miller responded, AI honestly don=t know. All this stuff is happening really fast. . . . When I am inside the car I really can=t see if he was kicking or not. I

13

honestly don=t think he was kicking with his feet, but his arms were going all over the place.@ At that point, Miller had not sustained any injuries. Then, M.C.L. began kicking the windows. Just as the officers were preparing to open the doors again to secure him better, M.C.L. kicked out a window. At that point, the officers returned to their vehicles and drove to a substation. Later, Miller noticed that his finger was bleeding.

M.C.L. argues that the evidence is factually insufficient to show that he kicked Horton because (1) Horton never testified that he was kicked and testified that Miller and Neyens were the two officers involved in restraining M.C.L., (2) Miller could not remember if M.C.L. was kicking with his feet but only recalled that his hands were flailing around, (3) M.C.L. was shackled before the struggle ensued and could not have used his feet to kick, and (4) Neyens was behind the car door and therefore could not see whether M.C.L. was kicking. Although Horton did not specifically testify that he was kicked, Neyens unequivocally stated that M.C.L. kicked both Horton and Miller. And although Neyens may have been behind the door when she witnessed the struggle, it was within the juvenile court=s discretion, as fact finder, to weigh the credibility of her testimony. *See Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001) (fact finder responsible for weighing all evidence, resolving evidentiary conflicts, and drawing reasonable conclusions from evidence); *Harmond v. State*, 960 S.W.2d 404, 407 (Tex. App.CHouston [1st Dist.] 1998, no pet.) (same). It was also within the court=s discretion to weigh the different descriptions of M.C.L.=s conduct and the struggle that transpired and determine whether M.C.L. assaulted Horton by kicking him. *Garcia*, 57 S.W.3d at 441; *Harmond*, 960 S.W.2d at 407. We cannot say that the evidence is so weak as to render the juvenile court=s finding that M.C.L. kicked Horton clearly wrong or manifestly

14

unjust, or that the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

We do not reach the same conclusion, however, with regard to the element of injury. Bodily injury is defined as physical pain, illness, or any impairment of physical condition. Tex. Pen. Code Ann. ' 1.07(a)(8) (West 2003). The definition is broad and encompasses even relatively minor physical contacts as long as they constitute more than mere offensive touching. *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989). But even applying this broad definition, the record is devoid of evidence that Horton suffered bodily injury as a result of M.C.L. kicking him. Neyens was the only witness who testified that Horton sustained injuries on his hands, but even she was uncertain as to whether the cuts were inflicted by the kicking or by the broken glass. Horton, on the other hand, testified that he did not suffer any injuries during the struggle to get M.C.L. back in the car before he kicked out the windows. His only testimony regarding bodily injury was that his hands were cut Awith shards of glass.@ Thus, we cannot say that the evidence is factually sufficient to support the finding that Horton suffered bodily injury as a result of M.C.L=s kicking him. The State must prove each and every element of the offense in order to sustain an adjudication of delinquency. Tex. Pen. Code Ann. ' 2.01 (West 2003); *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992). We therefore sustain M.C.L.=s fifth issue and reverse the portion of the juvenile court=s judgment finding that M.C.L. assaulted a public servant by kicking Horton and causing bodily injury; we remand for further proceedings.

**CONCLUSION**

15

M.C.L. was adjudicated delinquent based on the juvenile court=s finding that he committed four offenses: criminal mischief, two counts of assault on a public servant, and resisting arrest. M.C.L. did not challenge on appeal one of the allegations of assault on a public servant. That portion of the juvenile court=s adjudication judgment is affirmed as to the assault of Horton that caused bodily injury by cutting him with glass. With regard to the criminal mischief allegation, we conclude that the evidence is legally insufficient to support the juvenile court=s finding that M.C.L. committed the offense of criminal mischief, causing pecuniary loss in an amount more than $500 but less than $1,500. The evidence is legally and factually sufficient, however, to support a finding that M.C.L. committed criminal mischief resulting in a pecuniary loss of at least $50 but less than $500. We further hold that the evidence is legally insufficient to support the juvenile court=s finding that M.C.L. committed the offense of resisting arrest, as the arrest was already completed by the time M.C.L. began to struggle. Finally, we conclude that the evidence is factually insufficient to support the remaining assault on a public servant charge, as the evidence of bodily injury to Horton by kicking is so weak as to be clearly wrong and manifestly unjust and the juvenile court=s finding of bodily injury is so contrary to the weight and preponderance of the evidence as to be clearly wrong. Accordingly, we reverse the juvenile court=s judgment of adjudication and its disposition order on this charge and remand for further proceedings consistent with this opinion.

Bea Ann Smith, Justice

16

Before Chief Justice Law, Justices B. A. Smith and Puryear

Reversed and Remanded

Filed:   June 19, 2003