In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00103-CV
______________________________


 
 
IN THE MATTER OF
K. H., A CHILD
 
 
 


                                              

On Appeal from the County Court at Law #1
Gregg County, Texas
Trial Court No. 4699-J


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          K. H., a twelve-year-old boy, appeals from his adjudication for the offense of
retaliation. A jury found that K. H. engaged in delinquent conduct, and at a later disposition
hearing, the trial court committed K. H. to the Texas Youth Commission. K. H. contends
on appeal the evidence is legally and factually insufficient to prove he committed the
criminal act. 
          Proceedings brought under the Texas Juvenile Justice Code, Title 3 of the Texas
Family Code, are hybrid actions. They are brought as civil proceedings, but are
"quasi-criminal" in nature.


 As noted by the San Antonio court in In re K.T., 107 S.W.3d
65, 67 (Tex. App.—San Antonio 2003, no pet.), the language used to describe the
proceedings are euphemisms to describe juvenile proceedings that are parallel to criminal
proceedings: the adjudication is the trial, while the disposition is equivalent to a sentencing
proceeding. Nonetheless, the result of applying euphemisms, however well-intended, can
be confusing.
          Under the applicable statutes and caselaw, civil and criminal rules apply at different
stages of the same proceeding. Section 51.17 of the Family Code provides that the Texas
Rules of Civil Procedure shall apply, the Texas Code of Criminal Procedure and the
applicable criminal caselaw shall govern the discovery process, and the Texas Rules of
Evidence (as applied to criminal cases) shall be used during the judicial proceeding. Tex.
Fam. Code Ann. § 51.17 (Vernon Supp. 2004–2005). Section 54.03 of the Family Code
provides that the burden of proof in an adjudication hearing is the criminal burden: beyond
a reasonable doubt. Tex. Fam. Code Ann. § 54.03 (Vernon Supp. 2004–2005). If the trier
of fact determines the juvenile engaged in delinquent conduct, a separate disposition
hearing is conducted subsequent to the adjudication hearing. Tex. Fam. Code Ann.
§§ 54.03(h), 54.04 (Vernon Supp. 2004–2005). It is clear that, in reviewing the disposition
portion of the proceeding, we determine whether the trial court abused its discretion in the
disposition of the juvenile. We do not disturb the juvenile court's disposition order in the
absence of an abuse of discretion. In re H.R.C., 153 S.W.3d 266, 269 (Tex.
App.—El Paso 2004, no pet.); In re J.D.P., 85 S.W.3d 420, 426 (Tex. App.—Fort Worth
2002, no pet.); In re J.R., 907 S.W.2d 107, 110 (Tex. App.—Austin 1995, no writ); In re
E.F., 535 S.W.2d 213, 215 (Tex. Civ. App.—Corpus Christi 1976, no writ).
          The result of this patchwork arrangement is, predictably, a certain lack of clarity
among courts reviewing different stages of the process about the standards to be applied. 
It is within this context that we address an appeal brought solely on the adjudication portion
of the process. 
          In reviewing the adjudication itself, and the findings made as a result of the
adjudication, most courts apply a criminal legal/factual sufficiency review. Even though the
appeal of juvenile court orders are generally treated as civil cases, adjudications of
delinquency in juvenile cases are statutorily based on the criminal standard of proof. See
Tex. Fam. Code Ann. § 54.03(f). Thus, an adjudication should be reviewed by applying the
same standards applicable to sufficiency of the evidence challenges in criminal cases. 
In re J.B.M., 157 S.W.3d 823 (Tex. App.—Fort Worth 2005, no pet.); In re N.M.K., 137
S.W.3d 696, 697 (Tex. App.—Eastland 2004, no pet.); In re Z.L.B., 115 S.W.3d 188, 190
(Tex. App.—Dallas 2003, no pet.); In re M.C.L., 110 S.W.3d 591, 594 (Tex. App.—Austin
2003, no pet.).
          When both legal and factual sufficiency are challenged, we first determine whether
the evidence is legally sufficient to support the verdict. Rivera v. State, 59 S.W.3d 268,
273 (Tex. App.—Texarkana 2001, pet. ref'd). It is only if we find the evidence legally
sufficient that we then consider the factual sufficiency challenge. In other words, if we find
the evidence legally insufficient, we need not address the factual sufficiency challenge.


 
 
          In reviewing the legal sufficiency of the evidence, we view the relevant evidence in
the light most favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. Johnson v.
State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). 
          In this case, K. H. was charged with the offense of retaliation pursuant to Section
36.06 of the Penal Code. That statute provides, in relevant part, as follows: 
(a) A person commits an offense if he intentionally or knowingly . . .
threatens to harm another . . . :
 
(1) in retaliation for or on account of the . . . status of another
as a:
 
                                           (A) . . . witness, prospective witness, . . . ; or
 
(B) person . . . who the actor knows intends to report
the occurrence of a crime; or
 
                                (2) to prevent or delay the service of another as a:

                                           . . . .
 
(B) person . . . who the actor knows intends to report
the occurrence of a crime.

Tex. Pen. Code Ann. § 36.06 (Vernon Supp. 2004–2005).

          The State's evidence showed that K. H. possessed a gun on school premises and
displayed that gun to C. J., and told C. J. he would use the gun if C. J. told anyone about
it. The evidence further showed that, while the gun had the appearance of a firearm, it
was, in fact, an inoperable pellet gun.
          The State's petition accused K. H. of threatening to harm C. J. "in retaliation for or
on account of the status of [C. J.] as a person who was a witness to a crime, the same
being a Third Degree felony if committed as an adult." Alternatively, the State accused
K. H. of threatening to harm C. J. "to prevent and delay the service of [C. J.] as a person
who [K. H.] knew intended to report the occurrence of a crime, the same being a Third
Degree felony if committed as an adult." The jury charge explicitly sets out both options
and then goes on to authorize the jury to find K. H. guilty beyond a reasonable doubt, "as
alleged in the Petition." 
          As we will discuss later, the first accusation is not actionable under the retaliation
statute. The statute does not contemplate that the offense occurs if an actor threatens a
person because such person is a witness to a crime, but instead because the person is a
witness at trial. However, we first address the contention common to both accusations. 
          In his argument under both accusations, K. H. contends that, because each of the
underlying accusations alleged he had committed a crime, and because there was no
evidence he had committed such a crime, the State failed to meet its burden of proof and
the evidence cannot support the finding in the adjudication that he was guilty. We agree. 
 
          The question raised under both the first and second accusations is whether the
statute requires the state to show that the actor actually committed a crime, or if it was
sufficient that the person thought the act reported was a crime. Neither party has directed
us to any cases directly on point, and we have found none.


 
          The plain language of the statute applies solely to the occurrence of "a crime." It
does not implicate an act that a person might reasonably believe to be a crime. The
evidence is undisputed that K. H. took an inoperable pellet gun to school. K. H. was not
charged with a crime in connection with this act, and there was no suggestion or any proof
that the act was, in fact, a crime. The State's petition did not identify "the crime." 
          The crime suggested by the State in its closing argument to the jury is possessing
a weapon on the premises of a school, a violation of Tex. Pen. Code Ann. § 46.03 (Vernon
Supp. 2004–2005). While that offense is one punishable as a third degree felony, it
expressly describes a firearm as the kind of gun prohibited on school premises. A firearm
is "any device designed, made, or adapted to expel a projectile through a barrel by using
the energy generated by an explosion or burning substance or any device readily
convertible to that use." Tex. Pen. Code Ann. § 46.01(3) (Vernon 2003). James Mathis,
the police officer who seized the pellet gun from K. H.'s backpack, agreed in his testimony
that the pellet is propelled from this gun by compressed air. K. H. clearly did not violate
this statute. 
          "The crime" also could not have been unlawfully carrying a handgun, in violation of
Tex. Pen. Code Ann. § 46.02 (Vernon 2003), as a handgun is defined as "any firearm that
is designed, made, or adapted to be fired with one hand." Tex. Pen. Code Ann. § 46.01(5)
(Vernon 2003). 
          The State suggests in its brief K. H. could have been charged with the offense of
disorderly conduct and correctly writes, "It is disorderly conduct, and a crime, to display a
firearm or other deadly weapon in a public place in a manner calculated to alarm." See
Tex. Pen. Code Ann. § 42.01(a)(8) (Vernon Supp. 2004–2005). "Deadly weapon" is
defined as:
(A) a firearm or anything manifestly designed, made, or adapted for
the purpose of inflicting death or serious bodily injury; or 
 
(B) anything that in the manner of its use or intended use is capable
of causing death or serious bodily injury.

Tex. Pen. Code Ann. § 1.07(a)(17) (Vernon Supp. 2004–2005).

          As stated above, the gun in this case clearly was not a firearm. And, while the State
may have been able to prove K. H.'s gun was "capable of causing . . . serious bodily
injury,"


 the record in this case is devoid of any such evidence. The State cites Corte v.
State, 630 S.W.2d 690, 691–92 (Tex. App.—Houston [1st Dist.] 1981, pet. ref'd), for the
proposition that even an unloaded pellet gun can be a deadly weapon. In that case,
however, the First court pointed out that an investigator testified the gun used "was capable
of inflicting serious bodily injury." We have no such evidence in the instant case. 
          We are constrained by the language of the Penal Code, and we cannot stretch its
language to make "reasonably believed to be a crime" equivalent to "a crime." We find the
evidence legally insufficient to prove that an underlying crime existed. 
          There is a separate problem with the first allegation in the petition, also requiring
reversal on that accusation. Even if we assumed the existence of an underlying crime, the
State was required to prove C. J. was a "witness or prospective witness" as contemplated
by the statute. See Tex. Pen. Code Ann. § 36.06(a)(1)(A). The State's petition alleged the
offense was committed due to C. J.'s status as "a witness to a crime." The statute
criminalizes retaliation against a person who is a witness in court. The two terms are not
interchangeable. 
          In this context, the Texas Court of Criminal Appeals defines the term "witness" as
"one who has testified in an official proceeding." Jones v. State, 628 S.W.2d 51, 55 (Tex.
Crim. App. [Panel Op.] 1980); accord Morrow v. State, 862 S.W.2d 612, 614 (Tex. Crim.
App. 1993); see In re B.P.H., 83 S.W.3d 400, 407–08 (Tex. App.—Fort Worth 2002, no
pet.).
          A "prospective witness" is one who may testify in an official proceeding. Ortiz v.
State, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002); see Morrow v. State, 862 S.W.2d 612,
614 (Tex. Crim. App. 1993). A person who witnesses an offense, but who has not yet
testified in a trial involving that offense, is also a prospective witness. Morrow, 862 S.W.2d
at 614; see also Ortiz, 93 S.W.3d at 86 ("Any person who is involved in an offense with a
defendant, who sees the defendant committing an offense, or who hears the defendant
discuss committing an offense is a 'prospective witness' in the prosecution of that
defendant because he 'may' testify."); Stewart v. State, 137 S.W.3d 184, 187 (Tex.
App.—Houston [1st Dist.] 2004, pet. ref'd). The State's petition in this case, however, did
not allege C. J. was a "prospective witness."
          The State has directed us to our opinion in Solomon v. State, 830 S.W.2d 636 (Tex.
App.—Texarkana 1992, pet. ref'd), to support its position that the crime of retaliation was
committed because C. J. could have been a witness in a number of different ways. Our
opinion does so hold, but in connection with the separate portion of Section 36.06(a)(1)(A),
which describes a "prospective witness," not a witness, and the charging instrument in
Solomon also correctly alleged a threat against a person who was a prospective witness
in court, not a witness to an act. 
          K. H. contends there is no evidence to support the jury's finding that he threatened
C. J. in retaliation for the status of C. J. as a witness. He is correct; there is no evidence
to support that finding. The contention is sustained. 
          The State also argues in the alternative that, if we conclude the evidence is
insufficient, then a second charge of terroristic threat made against K. H., which was not
reached by the jury, should be treated as a lesser included offense, and we should reform
the judgment to find K. H. guilty of the lesser offense. Terroristic threat is committed when:
(a) A person . . . threatens to commit any offense involving violence
to any person or property with intent to:

                                . . . .
 
(2) place any person in fear of imminent serious bodily injury.

Tex. Pen. Code Ann. § 22.07 (Vernon Supp. 2004–2005).
          We first address the question posed in the second ground for review stated above.
A defendant is entitled to a lesser included offense instruction in the jury charge if (1) the
requested charge is a lesser included offense of the offense charged, and (2) there is
some evidence that, if the defendant is guilty, he or she is guilty only of the lesser offense.
To determine if an offense is a lesser included offense, we look to Article 37.09 of the
Code of Criminal Procedure, which states in relevant part: "An offense is a lesser included
offense if: (1) it is established by proof of the same or less than all the facts required to
establish the commission of the offense charged." Tex. Code Crim. Proc. Ann. art. 37.09
(Vernon 1981); see Irving v. State, No. PD-91-04, 2005 Tex. Crim. App. LEXIS 654 (Tex.
Crim. App. Apr. 27, 2005).
          Several courts have held that terroristic threat is not a lesser included offense of
retaliation because retaliation does not require that the actor threaten with the intent to
place a person in fear of imminent serious bodily injury. See Coward v. State, 931 S.W.2d
386, 389 (Tex. App.—Houston [14th Dist.] 1996, no pet.); Davis v. State, 890 S.W.2d 489,
492 (Tex. App.—Eastland 1994, no pet.); see also Helleson v. State, 5 S.W.3d 393, 396
(Tex. App.—Fort Worth 1999, pet. ref'd).


 Retaliation requires nothing other than a threat
to harm. Terroristic threat requires much more, a threat intended to place a person in fear
of "imminent bodily injury." This is the reverse of a lesser included offense situation, for
terroristic threat requires proof of a higher level of threat than does retaliation. Thus, we
do not believe that this greater level of threat could be subsumed within the lesser amount
required by retaliation. Even if the evidence could have supported such a result, the jury
did not pass on the greater level, and in the absence of uncontroverted, unchallenged
evidence, we could not put ourselves in the place of the fact-finder and so find for the first
time at this level of review. 
          When we find legally insufficient evidence to support a judgment, we typically
reverse and render. In this case, however, at the time of the adjudication and disposition
sending K. H. to the Texas Youth Commission, he was already on probation for a prior act,
and further action by the trial court will be required to effectuate our judgment. 
          For the reasons set forth above, we reverse the judgment and remand the case for
further proceedings in accordance with this opinion.


                                                                           Donald R. Ross
                                                                           Justice 

Date Submitted:      March 25, 2005
Date Decided:         July 26, 2005



zed minus the accompanying
"aggravating" elements, such as the use of a date rape drug or a deadly weapon) to the core of the
(simple) sexual assault statute, one can see that, except for the way the parts of each section are
numbered,   the   two   Penal   Code   provisions   are   identical.   Compare   Tex.   Pen.   Code
 Ann. §§ 22.011(a), 22.021(a)(1). Absent the aggravating conditions of aggravated sexual assault,
the person commits either offense if he or she "causes the penetration of the anus or sexual organ
of   another   person   by   any   means,   without   that   person's   consent,"   Tex.   Pen.   Code
Ann.  §§ 22.011(a)(1)(A), 22.021(a)(1)(A)(i); or "causes the penetration of the mouth of another
person  by  the  sexual  organ  of  the  actor,  without  that  person's  consent,"  Tex.  Pen.  Code
Ann. §§ 22.011(a)(1)(B), 22.021(a)(1)(A)(ii); or "causes the sexual organ of another person,
without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another
person, including the actor," Tex. Pen. Code Ann. §§ 22.011(a)(1)(C), 22.021(a)(1)(A)(iii). 
Accordingly, there is no logical reason to differ from the holding in Vick and our sister courts of
appeals mentioned above.
            We therefore hold that Texas' sexual assault statute, Section 22.011 of the Texas Penal
Code, is a conduct-oriented statute that prohibits distinct, yet very specific acts, with each act
therein proscribed constituting an independent unit of prosecution.



            Like the situation faced by the Fourth Court of Appeals in M.P., Mathonican's appeal
presents an indictment with three different paragraphs of Count Two that allege distinct and
separate offenses, not merely alternative theories of committing the same criminal offense. The
State prosecuted Mathonican for sexual assault, a conduct-oriented offense. The indictment's
second count thus alleged three different crimes: (1) causing J. M.'s sexual organ to penetrate
Mathonican's  anus,  (2)  causing  J.  M.'s  sexual  organ  to  penetrate  Mathonican's  mouth,  and
(3) causing Mathonican's penis to penetrate J. M.'s mouth. Thus, the trial court's charge should have
required independent verdicts on each of these different charges. Instead, the trial court's general
verdict form required only a single verdict, without requiring the jury to differentiate among the
charges in the indictment's second count. Accordingly, the jury charge contained error by not
requiring a unanimous verdict. Cf. Ngo, 175 S.W.3d at 748–49.
            (d) The Error Was Egregiously Harmful
            Having found error in the trial court's charge, we must next consider whether sufficient harm
resulted from that error. In this case, Mathonican did not object to the error in the trial court. 
Therefore, reversal is required "only if the error is so egregious and created such harm that
[appellant] 'has not had a fair and impartial trial . . . .'" Almanza, 686 S.W.2d at 171 (quoting Tex.
Code Crim. Proc. Ann. art. 36.19). In evaluating harm, we must assay the damage "in light of the
entire jury charge, the state of the evidence, including contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed by the record of the
trial as a whole." Almanza, 686 S.W.2d at 171.
            In this case, the erroneous jury charge enabled the jury to potentially return a nonunanimous
verdict as to any particular sexual assault offense charged. We believe this potential for lack of
unanimity was heightened by the State's closing argument:
Now when you go back to the verdict form, if you have found any one of
those three paragraphs [regarding the different allegations of aggravated sexual
assault] - - if you have found that the defendant did those things beyond a reasonable
doubt, then you sign the verdict form that says "aggravated sexual assault, guilty." 
It could be any one of those three paragraphs.
You don't have to believe all three of those beyond a reasonable doubt. You
can. You can believe - - you can look at them and say, I believe he was guilty of
this. I believe he was guilty of this. And I believe he was guilty of this. Or you can
pick - - I say - - I think he was guilty of the first one and not the second one or the
third one. But if you find any one of those paragraphs then it's aggravated sexual
assault.
Then in paragraph[s] 9, 10 and 11, it's the same thing with sexual assault. 
It's just alleging that the consent was without his consent because of - - he was
unaware that it was happening or he was passed out and couldn't physically resist. 
And that would be on the second page of the verdict form. That's why there's an
"or."
 
(Emphasis added.) In this passage, the State's use of the first person, nominative case pronoun "I"
suggests she was figuratively placing herself in the shoes of the individual jurors throughout her
argument. Had she been attempting to figuratively place herself in the collective shoes of the entire
jury, it would have been more reasonable for her to have avoided a first person, singular tense
pronoun and opted instead for either the first person plural, nominative case pronoun "we" or used
exclusively the second person nominative case pronoun "you." And, for the State to argue the
trinity of allegations contained in the indictment's second count as alternative theories of
committing the same offense rather than independent crimes further bolsters our analysis. 
Additionally, at the charge conference (as well as on appeal), the State consistently took the position
that the indictment's second count merely alleged alternative theories of the same offense, rather
than alleged separate crimes—a position that we now conclude was erroneous as a matter of law.
            The record reveals that facts central to the issues before the jury were in dispute. J. M.
testified that one of the charged assaults—that J. M.'s penis penetrated Mathonican's mouth—never
occurred. And, moreover, the testimony of one of the State's witnesses can be read to suggest that
J. M. and Mathonican had a prior sexual relationship, evidence that might cause a jury to discount
whether any of the alleged assaults truly involved nonconsensual conduct. And certainly, the record
in this case shows Mathonican contested the entirety of the State's case regarding whether the sexual
encounter involved consensual or nonconsensual acts.
            "The Texas Constitution guarantees due course of law and provides that a defendant charged
with a felony must be convicted by a unanimous jury." Hendrix, 150 S.W.3d at 849. The jury
charge in this case enabled the jury to return a nonunanimous guilty verdict in violation of
Mathonican's right under the Texas Constitution. That possibility was aggravated by the State's
closing argument. Accordingly, after considering the entire jury charge, the state of the evidence
(including contested issues and the weight of probative evidence), the arguments of counsel, and
all the information relevant to the jury charge error, we must conclude the error caused Mathonican
egregious harm. We sustain Mathonican's first point of error.
(2)       On Remand, the State May Again Seek a Deadly Weapon Finding
            Mathonican's second and third points of error challenge the factual and legal sufficiency of
the evidence to support the affirmative finding that Mathonican used or exhibited a deadly weapon
during the commission of the sexual assaults. The third count of the indictment alleged Mathonican
used his "seminal fluid" as a deadly weapon during the commission of the offense(s) because
Mathonican carries the human immunodeficiency virus (HIV). 
            Because we reverse Mathonican's conviction and remand for a new trial, that result requires
us to address Mathonican's legal sufficiency challenge to the deadly weapon finding. Only if there
was legally sufficient evidence that Mathonican, during the offense, used or exhibited a deadly
weapon, namely his seminal fluid, may the State, on remand, seek a deadly weapon finding. We
conclude the evidence was legally sufficient and that, therefore, the State may, again, seek a deadly
weapon finding.
            The state of the evidence relevant to this issue can be quickly enumerated. After the alleged
offenses, traces of semen from both Mathonican, who was admittedly HIV positive, and J. M. were
found on the sheet on Mathonican's bed where the offenses are alleged to have occurred, as well as
on a shirt found in Mathonican's living quarters. No evidence expressly showed when the semen
deposits were made, and there was some—though conflicting—evidence that some undetailed
sexual contact may have occurred between the two before the occasion of the alleged offense. The
day after the alleged offense, J. M. presented himself for a rape examination, which revealed no
semen on the oral or anal swab specimens he provided. Subsequent tests revealed no HIV
antibodies in J. M.'s body. 
            When we review the legal sufficiency of the evidence to support any particular evidentiary
finding, we must view the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have made the finding beyond a reasonable doubt. Drichas v. State,
175 S.W.3d 795, 798 (Tex. Crim. App. 2005); Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim.
App. 2003) (citing Jackson v. Virginia, 443 U.S. 307, 318–19 (1979)). The jury's deadly weapon
finding against Mathonican can survive a legal sufficiency challenge only if there is legally
sufficient evidence to support findings that (1) Mathonican's seminal fluid meets the statutory
definition of a deadly weapon,


 (2) his seminal fluid was used or exhibited during the alleged
offense, and (3) some person was put in actual danger. See Drichas, 175 S.W.3d at 798.
            The presence at the scene of commingled semen deposits from both men, found just after
the alleged offense, when added to the evidence of various types of sexual contact between the two
of them on this occasion, including penile penetrations by both Mathonican and J. M., provided the
jury a sufficient and legitimate basis to find that Mathonican's seminal fluid had been used or
exhibited during the sexual contacts in question. While there was some evidence of a possible
previous sexual relationship between the two, that evidence was disputed by J. M.'s testimony. 
Given the conflict in that evidence, the jury was entitled to believe that there had been no prior
sexual relationship between the two men and that the semen deposits were made at the time of the
alleged offense.
            The apparent absence of semen on the oral or anal swabs taken from J. M.'s body the day
after the alleged offense, and the subsequent lack of HIV antibodies found in his body, do not
logically subvert the other evidence. The law does not require that a deadly weapon actually be
used against anyone or even that anyone be in a "zone of danger," but merely that a deadly weapon
be exhibited or used and that someone be in some danger.
 
 
            As the Texas Court of Criminal Appeals recently stated,
Objects that are not usually considered dangerous weapons may become so,
depending on the manner in which they are used during the commission of an
offense. Thomas v. State, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991). A motor
vehicle may become a deadly weapon if the manner of its use is capable of causing
death or serious bodily injury. Ex parte McKithan, 838 S.W.2d 560, 561 (Tex.
Crim. App. 1992).
Drichas, 175 S.W.3d at 798. The same is true of seminal fluid. It may become a deadly weapon
that is used or exhibited, if the man producing it is HIV-positive and engages in unprotected sexual
contact. See Najera v. State, 955 S.W.2d 698, 701 (Tex. App.—Austin 1997, no pet.) (evidence
of unprotected sexual intercourse by HIV-positive man, evidence on how HIV is transmitted and
the deadly effect of contracting the virus, but without evidence of ejaculation by defendant or age
of semen stain sufficient for finding that penis and seminal fluid were deadly weapons).
            A deadly weapon is "anything that in the manner of its use or intended use is capable of
causing death or serious bodily injury." Tex. Pen. Code Ann. § 1.07(a)(17)(B). We believe it has
come to be beyond reasonable debate, generally known, and readily determinable by resort to
unassailable sources, that seminal fluid from an HIV-positive man is capable of causing death or
serious bodily injury to another person when the HIV-positive man engages in unprotected sexual
contact.


 Therefore, that basic truth therefore need not be established at trial by expert testimony.



            In recent years, courts have universally recognized as judicially noticeable the fact that
seminal fluid produced by an HIV-positive man during unprotected intimate sexual contact can
transmit the virus, risking the transmittee contracting AIDS.
Over the past decade, our nation's understanding of possible methods of transmitting
the HIV has increased dramatically. It is a well-known fact that an infected
individual may possibly transmit the HIV through unprotected sexual intercourse
with his or her partner. We take judicial notice of the fact that the HIV may be
transmitted through contact with an infected individual's blood, semen or vaginal
fluid, and that sexual intercourse is one of the most common methods of passing the
virus.
State v. Keene, 629 N.W.2d 360, 365 (Iowa 2001) (citations omitted).
 
The trial court took notice of ["several well-established and scientifically understood
facts about AIDS and its transmission" including that "blood, semen, vaginal fluids,
and breast milk" can transmit HIV], an action which we affirm.
Faya v. Almaraz, 620 A.2d 327, 331 n.2 (Md. App. 1993).
 
We take judicial notice of the fact that the HIV virus is a precursor to AIDS, a
progressive and inevitability [sic] fatal disease syndrome. We further take judicial
notice of the fact that intimate sexual contact whereby blood or semen of an infected
person is transferred to an uninfected person is a primary method of spreading the
infection.
People v. Russell, 630 N.E.2d 794, 795 (Ill. 1994).
All authorities have agreed that the disease is capable of being transmitted through
sexual intercourse, is infectious, and is dangerous to the public health . . . . We agree
that the district court could take judicial notice of the seriousness and the potential
for transmissibility of the disease AIDS.
Dunn v. White, 880 F.2d 1188, 1196 (10th Cir. 1989). Also approving judicial notice that
unprotected sexual contact with an HIV-positive person risks transmission of HIV are State v.
Mahan, 971 S.W.2d 307, 309 (Mo. 1998); Tischler v. Dimenna, 160 Misc.2d 525, 529–32 (N.Y.
Misc. 1994); State v. Hutchinson, 734 N.E.2d 454, 457 (Ohio App. 1999) (extensive discussion:
"In discussing the qualities, etiology, epidemiology and methodology of AIDS the court is taking
judicial notice of those medical facts which are now considered indisputable."). 
            In a Colorado case involving a remarkably similar deadly weapon provision—"capable of
producing death or serious bodily injury," Colo. Rev. Stat. § 18-1-901 (3) (e) (IV)—and an HIV-positive defendant, the Colorado Court of Appeals recognized that "the dangers of HIV are widely
known." State v. Shawn, 107 P.3d 1033, 1035–36 (Colo. App. 2004); see Brock v. State, 555 So.2d
285 (Ala. Crim. App. 1989) (judicial notice taken that AIDS is life-threatening disease and
contraction of HIV would be serious physical injury).
            Further, J. M. testified to his understanding that unprotected sexual contact involving an
HIV-positive person risks transmission of the virus.
            We find that the evidence in this case, viewed in a light most favorable to the prosecution,
supports a conclusion that a rational trier of fact could have found beyond a reasonable doubt
(1) that Mathonican's seminal fluid was capable of causing death or serious bodily injury in the
manner of its use or intended use,


 (2) Mathonican's seminal fluid was used or exhibited during the
alleged offenses, and (3) Mathonican thus put J. M. in danger of death or serious bodily injury. The
jury could have properly found that the danger to J. M. was real, that is, more than hypothetical. 
J. M. need not have been in an actual zone of danger; it is sufficient that Mathonican's seminal fluid,
as used or as intended to be used, was capable of causing death or serious bodily injury to J. M.,
even without proof that it did so or that it had any probability to do so. See Drichas, 175 S.W.3d
at 799–800.
            The evidence was legally sufficient for a deadly weapon finding. Therefore, the State may,
again, seek such a finding when this case is tried on remand.
Conclusion
            Texas' sexual assault statute is a conduct-oriented offense. The State's indictment alleged,
not alternative theories of committing the same offense of sexual assault, but instead alleged three
different crimes under the sexual-assault statute. The trial court charged the jury in the disjunctive
without requiring the jury to unanimously agree on any single charge of sexual assault. The State's
closing argument at trial further exacerbated the error within the jury charge, to the degree that we
must conclude Mathonican suffered egregious harm.
            Accordingly, we reverse the trial court's judgment and remand the case for a new trial. On
remand, the State may, again, seek a deadly weapon finding.
 
 
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice
 
 
 
 
CONCURRING IN PART, DISSENTING IN PART
            In the first section of its opinion, the majority concludes that Texas' sexual-assault statute,
Tex. Pen. Code Ann. § 22.011 (Vernon Supp. 2005), is a conduct-oriented statute. The majority
also concludes the trial court erred by submitting a charge to the jury that did not require a
unanimous verdict, in violation of Mathonican's rights under the Texas Constitution. Because I
agree with that analysis and conclusion, I concur with respect to that part of the majority opinion.
            I respectfully dissent, however, with regard to the majority's conclusion that the evidence
supporting the jury's affirmative finding that Mathonican used or exhibited a deadly weapon is
legally sufficient and that the State may, therefore, again seek such a finding on retrial. 
            The State's indictment alleged that Mathonican used or exhibited his seminal fluid during
the commission of the sexual assault and that Mathonican's seminal fluid was a deadly weapon. 
The jury agreed and made an affirmative deadly weapon finding. Mathonican contends on appeal
that the State's evidence on this issue is legally and factually insufficient. That evidence showed 
Mathonican had the human immunodeficiency virus (HIV), and Mathonican concedes that a
mixture of his and J. M.'s DNA was found from semen stains on a sheet and a shirt at the crime
scene. I contend this circumstantial evidence is legally insufficient for a number of reasons.
            First, there was no proof of how long the stains had been on the sheet and shirt, and the
evidence showed possible previous sexual encounters between J. M. and Mathonican. The
majority opinion states that J. M. disputed the evidence of a possible previous sexual relationship
between the two. J. M. testified under cross-examination, however, that he would not necessarily
know if he had had sex with Mathonican before, as they "drank a lot over there." He said that it was
a "possibility" and that it "could have happened." 
            Second, the scientific analysis of the rape kit specimens taken from J. M. less than ten hours
after the assaults


 shows that "[n]o spermatozoa, cellular constituents of semen, were detected on
the anal, oral, or oral rinse smear slides" and "[a] presumptive test for the presence of semen was
negative on the anal, oral, and oral rinse swabs . . . ." Further, medical testing done four days after
the assault, and later, confirmed the absence of HIV antibodies in J. M.'s system.  
            Third, and perhaps most significant, there was no expert medical testimony regarding the
transmission of HIV, the virus' characteristics, or what the likely outcome of contracting the virus
would be. While the scourge of HIV, the virus that causes Acquired Immune Deficiency Syndrome
(AIDS), has been widely publicized, I believe several characteristics of that virus are still outside
the realm of the public's common knowledge. For example, despite the best efforts of governmental
health agencies and private charitable organizations working in the medical fields, I doubt the
general populace understands the various ways the virus can and cannot be transmitted. Nor do I
believe it is common knowledge that certain sexual behaviors carry an inherently greater risk of
transmitting the virus than do other types of sexual behaviors. J. M., for example, testified in the
instant case that he did not know the different ways a person can contract the HIV virus and that he
did not believe it could be transferred through the mouth. 
            Which behaviors are riskier than others? What degree of risk for transmitting HIV did the
behaviors (that the jury found Mathonican and J. M. engaged in) present to J. M.? Did the fact that
J. M. subsequently tested negative for HIV suggest J. M. had, in fact, not been exposed to
Mathonican's seminal fluid? What is the gestation period for the virus, and how long can it take
for it to show up? Is it possible that Mathonican could have, without reaching climax during any
of the sexual acts, still transmitted (or exhibited) a medically significant amount of the HIV such
that a rational fact-finder could conclude Mathonican's seminal fluid was "used or exhibited" as a
deadly weapon during the commission of the assault? Is HIV necessarily deadly, or is it possible
to live with HIV without the disease developing into AIDS? The jury had no expert medical or
scientific testimony to answer these and many other fundamental questions—questions which I
believe should be addressed before a jury can rationally conclude seminal fluid containing HIV is
necessarily a deadly weapon.
            In Najera v. State, 955 S.W.2d 698 (Tex. App.—Austin 1997, no pet.), cited by the majority,
the Third Court of Appeals affirmed an aggravated sexual assault conviction based on a finding that
the defendant used or exhibited HIV-positive seminal fluid during the commission of the offense. 
In that case, however, the jury heard expert medical testimony from Donna Stanley, the serologist
who tested the various blood and semen stains found on the evidence. Id. at 700-01. The jury also
heard testimony from Robert Kaspar, M.D., an infectious disease specialist and the director of an
HIV/AIDS treatment center. Id. at 701. Kaspar explained to the jury how HIV can be transmitted,
specifically during sexual intercourse. Id. He also explained the link between HIV and AIDS, and
further testified that AIDS is a disease for which there is no known cure. Id. And Kaspar testified
that "[a]ccording to statistics current at the time of [Najera's] trial in February 1996, ninety-five
percent of persons who contract HIV die within twelve years." Id. By contrast, none of this expert
medical evidence or testimony was offered in Mathonican's trial.
            Similarly, in Weeks v. State, 834 S.W.2d 559 (Tex. App.—Eastland 1992, pet. ref'd), the
Eleventh Court of Appeals affirmed the attempted murder conviction of an HIV-positive inmate
who spit on a prison guard in an attempt to infect the guard with HIV. There, as was the case in
Najera, the jury heard expert medical testimony from a number of experts. 
Mark E. Dowell, M.D., a doctor of infectious diseases at Baylor College of
Medicine; Paul Drummond Cameron, Ph.D., Chairman of the Family Research
Institute; Albert D. Wells, D.D.S., a dentist employed by the Texas Department of
Criminal Justice at the Coffield Prison Unit; and Lorraine Day, M.D., an orthopedic
surgeon employed by the University of San Francisco and Chief of the Orthopedic
Department  at  San  Francisco  General  Hospital,  testified  on  behalf  of  the state. 
Dr. Dowell, Dr. Cameron, and Dr. Day qualified as experts on HIV.
 
The witnesses collectively explained to the jury how HIV can be carried in an infected patient's
saliva, how the virus can be spread, and the probability of infection through transfer via saliva from
an infected person to an uninfected person. Id. at 562–65. The appellate court concluded that the
State's expert medical evidence was sufficient to support Weeks' conviction. Id. at 565. However,
unlike the record in Weeks, the record now before us reveals no similar quantity or quality of expert
medical testimony on HIV, the virus' rate of transmission under facts similar to those alleged to
have occurred between J. M. and Mathonican, or the rate at which HIV becomes the deadly disease
AIDS. 
            The majority opinion states that expert testimony was not required in the instant case
because courts may take judicial notice "that seminal fluid from an HIV-positive man is capable of
causing death or serious bodily injury to another person when the HIV-positive man engages in
unprotected sexual contact," citing several cases from various jurisdictions. In none of the cases
cited, however, was there a finding made—or required to be made—by the jury which either
determined that transmission of HIV or bodily fluids was accomplished in a manner constituting
use or exhibition of a deadly weapon. Further, in almost all these cases—the exception being cases
decided at the summary judgment or early dismissal phase—some form of expert medical testimony
was presented as evidence of how HIV is transmitted or the inherent dangers of such transmission.


 
           Another problem with the majority's judicial notice approach in this case is that there is
nothing in the record showing that the trial court took judicial notice of anything. I agree that the
trial court has the power to take judicial notice of adjudicative facts, either sua sponte or on motion
of either party. Tex. R. Evid. 201. Such notice by the trial court in a criminal case, however, is not
binding on the jury. The trial court must instruct the jury that it may, but is not required to, accept
as conclusive any fact judicially noticed by the court. See Tex. R. Evid. 201(g). 
            I do not quibble with the established scientific conclusions regarding the dangers of HIV
infection and the nature of its transmission. Perhaps judicial notice of such facts by the trial court,
and a corresponding instruction to the jury, would have been appropriate in this case. The problem,
however, is that no such judicial notice was requested or taken, and consequently, no instruction
was given to the jury.
            Citing Drichas, 175 S.W.3d at 798, the majority opinion states that the deadly weapon
finding in this case required a showing that (1) Mathonican's seminal fluid meets the statutory
definition of a deadly weapon, (2) his seminal fluid was used or exhibited during the alleged
offense, and (3) some person was put in actual danger. Again, the deadly weapon alleged in this
case was Mathonican's seminal fluid. The only evidence of seminal fluid, however, was a medical
report showing the presence of semen stains—for an unknown period of time—on a sheet and a
shirt. The record is totally devoid of any evidence that the presence of those stains constituted a
danger to anyone. See Drichas v. State, No. 06-04-00002-CR, 2006 WL 193135 (Tex.
App.—Texarkana Jan. 27, 2006) (not designated for publication). 
            For these reasons, I respectfully dissent to the majority's conclusion that the evidence
supporting  the  jury's  affirmative  finding  that  Mathonican  used  or  exhibited  a  deadly  weapon 
 
 
 
is legally sufficient. The State should not be permitted, on retrial, from again seeking a deadly
weapon finding.


 
 
 
                                                                        Donald R. Ross
                                                                        Justice
 
Date Submitted:          February 23, 2006
Date Decided:             May 12, 2006
 
Publish